NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0540n.06
Filed: June 23, 2005

No. 03-4358

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

JUANITA L. PASCO,                                )
                                                 )
    **Plaintiff-Appellant,**                     )
                                                 )
                                                 )   **ON APPEAL** FROM THE
v.                                               )   UNITED STATES DISTRICT
                                                 )   COURT FOR THE SOUTHERN
                                                 )   DISTRICT OF OHIO
COMMISSIONER OF                                  )
SOCIAL SECURITY,                                 )
                                                 )   **O P I N I O N**
    **Defendant-Appellee.**                      )
_____ )

Before: SILER and ROGERS, Circuit Judges, and CALDWELL,[*] District Judge.

    **KAREN K. CALDWELL, District Judge.** Pursuant to 28 U.S.C. § 1291, Juanita Pasco appeals the denial of disability benefits under the Social Security Act. The district court had jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review the final decision of the Commissioner, whose decision became final after the Social Security Administration Appeals Council declined to review the decision of the Administrative Law Judge (ALJ). The district court affirmed the Agency's final decision. This Court has jurisdiction to review the district court's judgment pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 1291. For the reasons stated herein, we

---

[*]The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting by designation.

**AFFIRM** the district court's judgment.

**FACTUAL BACKGROUND**

Pasco believes her alleged disability is a result of a horrific, traumatic experience she suffered over twelve years ago. In 1992, Pasco, while working as a bartender at Walt's Lounge, was kidnapped, raped, and shot twice in the head. She underwent surgery and was hospitalized for twelve days. When she was released, her treating physician, Dr. Marion, noted that Pasco was "alert, awake, oriented in all spheres, had no focal neurologic deficits and was in otherwise excellent condition." (J.A. at 178).

Over the next few years, Pasco was monitored by various physicians, including a neurologist, Srini Govindan, M.D. Pasco had an EEG in 1995 that was interpreted as "probably abnormal" and a second one that same year interpreted as "mildly abnormal." Dr. Govindan also reported that Pasco experienced some visual phenomena in 1995. By 1996, however, Dr. Govindan found that Pasco was displaying few, if any, significant neurological problems, though Pasco had complained of memory spells and visual problems. At no time did she appear to have any seizure activity.

From time to time, Pasco was treated for bouts with depression and post-traumatic stress disorder following the kidnap and rape through a combination of counseling and medication (Prozac or Paxil). However, she did not consistently follow up with all treatment recommendations.

In 1997, Pasco applied for disability benefits, but was denied. She did not appeal that decision.

Between 1992 and 1997, Pasco held jobs as a cashier, retail clerk, and fast food restaurant employee. From 1997 to 1999, she worked as a cashier at a BP Amoco station. In the fall of 1999, she worked for three months as a retail clerk at K-Mart. She claims that constant leg and foot pain

caused her to quit. She also claims that while driving a long commute (to both the BP and K-Mart jobs) she had memory problems and would "blank out" at times, not remembering what had happened in the prior five to ten minutes.

Pasco filed new applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) on June 9, 2000, alleging she became unable to work November 5, 1999, due to "constant" pain in legs and feet, memory loss, and ear aches. (J.A. at 123). She claimed that these ailments plus headaches, depression, and a "constant problem with [her] left ear" limited her ability to work. (J.A. at 123). After applying, she saw another series of physicians and psychologists, both on her own initiative and at the request of the Social Security Administration ("SSA").

The SSA denied Pasco's applications, having determined that Pasco's condition was not severe enough to keep her from working. (J.A. at 64). The SSA found that Pasco experienced leg and foot pain and discomfort, but was able to walk normally during medical examinations. It found that her movements and strength were normal and allowed her to function normally in order to perform a wide range of work activities. (J.A. at 65). On reconsideration per Pasco's request, the SSA stated that Pasco was able to "perform activities such as standing, walking, lifting, and carrying." (J.A. at 70).

The SSA noted that the medical evidence showed that Pasco experienced depression and had problems with her memory, but it found that although she was "limited" by her condition, the evidence showed that she was still able to follow instructions and function satisfactorily in order to perform work tasks that are simple and routine. The SSA recognized that Pasco's condition prevented her from doing her past jobs, but it did not prevent her from doing "other work which

takes place in a low stress environment." (J.A. at 65, 70).

Pasco requested a hearing before an ALJ. In a pre-hearing brief, Pasco's counsel noted that medical sources had diagnosed Pasco with traumatic brain injury and post-traumatic stress disorder and described Pasco's history of blackouts and anxiety on the job. (J.A. at 173). The brief noted abnormal EEG and SPECT scans from 1995 and argued that the medical evidence supported a finding that Pasco meets the listings for "Organic Brain Disorder" under listing 12.02 of the regulations. Counsel also argued that Pasco's leg pain and swelling, clonus in her upper extemities, and headaches met the definition of "severe" under 20 C.F.R. § 404.1521.

The ALJ held a hearing on July 25, 2001, at which Pasco and a vocational expert ("VE") testified. On January 7, 2002, the ALJ issued his decision finding that Pasco was not disabled because she could perform a significant number of jobs as identified by the VE. The Appeals Council denied Pasco's request for a review of that decision. Pasco then filed a complaint seeking judicial review in the United States District Court for the Southern District of Ohio. On August 19, 2003, a United States magistrate judge issued a Report and Recommendation ("R&R") that the district court affirm the ALJ's decision denying Pasco's application for benefits. Pasco objected to the Report, but on September 26, 2003, the district court issued an Order adopting the Magistrate's R&R. Judgment was entered against Pasco, and she filed a timely Notice of Appeal.

In her brief's fact sheet, Pasco states that her claim is based on the following injuries, conditions, and diseases: traumatic brain injury with post-traumatic symptoms; craniotomy defect; constant tinnitus and diminished left hearing; hyperflexia; clonus, myoclonus, twitching; lack of coordination; headache; blackouts and "spells"; post-traumatic stress disorder; and depression.

**ALJ'S DECISION**

In assessing whether a claimant is disabled, an ALJ must follow the sequential five-step process prescribed in 20 C.F.R. § 404.1520:

*Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.* In Pasco's case, the ALJ found that Pasco had not engaged in substantial gainful activity since her alleged onset of disability in 1999. (J.A. at 17).

*Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.* At this step, the ALJ found that Pasco had the following "severe" impairments within the meaning of the regulations: post-traumatic stress disorder, depression, and borderline intellectual functioning. (J.A. at 18). The ALJ did not find severe the following impairments alleged by Pasco: headaches, clonus, and leg and foot pain. (J.A. at 18-19).

*Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.* The ALJ found that Pasco's impairments or combination of impairments did not equal one of the impairments listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (hereinafter "Appendix 1"). (J.A. at 18).

The ALJ then turned to Steps Four and Five -- determining whether Pasco has the residual functional capacity ("RFC") to perform the requirements of her past relevant work or other work existing in significant numbers in the economy. After considering Pasco's complaints and medical evidence (J.A. at 19-23), the ALJ concluded that Pasco retained the following RFC: she has no physical limitations; she must work in a low stress environment; she must be limited to work involving one-to-two-step instructions and tasks; and she can have no more than occasional

interaction with others. (J.A. at 23). This RFC, however, is different from the one the ALJ posited to the vocational expert at the July 2001 hearing. At the hearing, the ALJ posited to the vocational expert a "light" RFC scenario in which Pasco was physically limited to performing "light work with a sit/stand option." (J.A. at 52). The ALJ acknowledged the change in the physical limitations part of the RFC in his decision: "Although the [ALJ] gave the vocational expert a light RFC at the hearing, further review of the record has established that no reduction in the claimant's RFC is warranted." (J.A. at 23). The ALJ ultimately found that Pasco had the RFC to perform a "significant range of work at all exertional levels," but not "a full range of work at any level." (J.A. at 25).

*Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.* The ALJ found, under Step Four, that Pasco's RFC would not allow her to perform her past relevant work.

*Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.* On Step Five, the ALJ found that Pasco's RFC allowed her to perform a significant number of jobs in the national economy. The ALJ specifically referred to the VE's testimony (in response to a light RFC) that Pasco could work as either an office cleaner (400,000 jobs nationally/ 8,000 regionally) or hotel/motel cleaner (200,000 jobs nationally/ 4,000 regionally). (J.A. at 25).

**STANDARD OF REVIEW**

"This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th

Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *Walter v. Comm'r of Soc. Sec.*, 127 F.23d 525, 528 (6th Cir. 1997)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). This Court is not to resolve conflicts in the evidence or examine the credibility of the claimant's testimony. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390; *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

**CLAIMANT'S ASSIGNMENTS OF ERROR & ANALYSIS THEREOF**

Pasco alleges that, in evaluating the severity of her physical and mental symptoms, considering whether they were or were part of an impairment listed in Appendix 1, and formulating her RFC, the ALJ erred by (1) failing to analyze Pasco's complaints of pain and other limitations in accordance with *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986); (2) failing to defer to the opinions and diagnoses of treating sources Charkawi and Govindan; (3) failing to mention a finding by consultative medical source Dr. Chattha; (4) failing to mention treating psychologists Drs. McFadden, Bailey, and Worthington; (5) failing to credit testimony by Pasco's roommate; (6) failing to mention testimony from Pasco's mother; (7) failing to combine severe and non-severe impairments when considering whether Pasco had an impairment listed in Appendix 1; (8) failing to defer to previous findings of headaches and leg and foot pain made by the SSA; (9) failing to apply what Pasco calls "the Walston inference"; (10) failing to consider "Traumatic Brain Injury" and "Organic Brain Disorders" as possible impairments under Appendix

-7-

1; (11) giving the vocational expert an RFC that differed from the one the ALJ ultimately found; and (12) formulating an RFC for Pasco that was not based on substantial evidence in part by relying on selected medical opinions while ignoring others. We will address these individually alleged errors briefly as we consider the record as whole.

**Analysis under *Duncan*.**

Subjective complaints of "pain or other symptoms shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A). This Circuit set forth the standard for evaluating subjective complaints of pain or limitations in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986):

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

801 F.2d at 853.

Pasco alleges that the ALJ "failed to follow binding Sixth Circuit precedent, *Duncan* . . . and offspring. . . ." Appellant Brief at 18. It is not clear, however, whether she believes the ALJ erred by not explicitly following the *Duncan* framework, or whether she merely challenges the findings by the ALJ under a *Duncan* analysis.[1]

---

[1]Pasco argues that we should judge the ALJ's failure to follow *Duncan* under the legal error standard rather than the substantial evidence standard, thus suggesting that she believes the ALJ failed to perform a *Duncan* analysis. However, Pasco's statement that the ALJ's finding of severe impairments (post-traumatic stress disorder, depression, and borderline intellectual functioning) "meets the first part" of the *Duncan* analysis suggests otherwise. Appellant Brief at 20.

To the extent that Pasco alleges that the ALJ failed to analyze Pasco's complaints of pain and other physical or mental limitations under *Duncan*, we find that this allegation has no merit. The ALJ specifically noted in his decision that he had evaluated her symptoms, including pain, under the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Ruling 96-7p. (J.A. at 19). This Court has previously held that analysis under these regulations is not inconsistent with the standards we set forth in *Duncan*. *McCoy v. Chater*, 81 F.3d F.3d 44, 47 (6th Cir. 1995). We thus agree with other panels of this Court that an ALJ who follows the requirements of 20 C.F.R. § 404.1529 does not commit error by failing to explicitly follow *Duncan*. *See Baranich v. Barnhart*, 2005 WL 894363, *5 (6th Cir. 2005) (unpublished).

We thus turn to using the *Duncan* framework to review the ALJ's findings regarding Pasco's complaints of pain and other physical and mental limitations.

*Leg and Foot Pain*

One of the primary reasons Pasco claims that she left her last job is leg and foot pain. At her hearing, Pasco testified that she quit because "I just can't be on my legs like that," alleging that her legs hurt and her feet went numb. (J.A. at 39-41). She alleged that she also left the job prior to that due in part to problems standing. She alleged that she had swelling and numbness in her legs and feet for five years prior to the hearing. The ALJ, however, found no objective evidence of a condition that would cause her standing and walking limitations. Pasco notes that a number of doctors noted either "bumps" or "nodules" on her legs.[2] However, under the second step of *Duncan*,

---

[2]In 1993, Pasco complained of foot pain to Dr. Gene Kennedy, who subsequently noted small skin masses (though it is not clear from the notes if these masses were on her legs and feet). (J.A. at 270). In 1994, Dr. Kennedy wrote that he was going to try to set up an appointment with Dr. Govindan (Pasco's treating neurologist) regarding "subcutaneous bumps"

this objective evidence of nodules neither confirms the severity of pain of which Pasco complains nor is of such a severity that can reasonably be expected to cause the pain. *See Duncan*, 801 F.2d at 853. We can find no other such medical evidence in the record.

*Headaches*

Pasco has also complained of headaches.[3] The ALJ, however, found that there was "no objective evidence that these are frequent or severe enough to be disabling or that they even impose more than minimal functional limitation." The ALJ noted that the Midrin medication Pasco took "largely controls" them.[4] (J.A. at 18).

After reviewing the record under the *Duncan* framework, we conclude that the ALJ's finding concerning headaches was not erroneous under the substantial evidence standard. While Pasco's head injury from her 1992 shooting is objective evidence suggesting a reason for her having

---

on Pasco's legs that Pasco alleged were increasing in number and size. (J.A. at 259). Later in the same year, Dr. Kennedy noted that Pasco again complained of the painful nodules on her anterior shins; he stated that the nodules were "stable" and "mildly tender to direct pressure." (J.A. at 252). In 1997, Pasco complained of numbness from "knots" in her legs to Dr. Chattha, a neurologist examining her in connection with a prior administrative claim. (J.A. at 336). In 2001, Dr. Charkawi, a family physician, noted bumps along her leg, but did not link these bumps with her complaints of standing and walking due to cramps in her legs. Pasco testified at her hearing before the ALJ that she had never had extensive tests performed on her legs because she could not afford them and her workers compensation plan would not cover them.

[3]At her July 2001 hearing, Pasco testified that her headaches were "different all the time. It's not like getting a migraine or something all the time. It's like sometimes it's on this side of my head, sometimes it's on this side. Sometimes I just get shooting pains toward the back of my head where the hole is where they did surgery." (J.A. at 44). In response to the ALJ's inquiry into how often she gets the headaches, she replied, "[S]ometimes it depends on what I'm doing or what my emotional state is. Like today I have a real nice one because I'm nervous. And if I get upset and I get nervous then I get them." *Id.*

[4]Pasco's reply brief claims that her headaches are more severe than the ALJ found because she took Vistaril for the headaches in 1997.

-10-

headaches (or at least the headaches she described as "shooting pains" near the hole in her head where the surgery was performed), there is no objective evidence which suggests that the headaches are so severe that they would keep her from working so long as she takes medication.

*Clonus*

At her July hearing, Pasco testified that she had a "hard time holding onto things for a period of time. My hand – I just, I don't know how, maybe I just forget I'm holding, I don't know, but I just drop. And I can't hold any kind of weight I just start shaking. I can't hold anything for a period of time." (J.A. at 46). A treating physician, Dr. Charkawi, stated that Pasco had clonus in her upper extremities in a medical report to a state agency. (J.A. at 409). The ALJ, however, found that there was "insufficient objective evidence to support a severe impairment of clonus, or other limitations in the upper extremities. This condition was mentioned by Dr. Zack Charkawi, M.D., a family practice physician (Exhibit 23F). However, neither Dr. Charles Paroda, an examining physician, nor Dr. Govindan, a treating neurologist from March 29, 1995[,] through March 8, 2001, made note of this condition. [This condition is] therefore not considered [a] severe impairment." (J.A. at 18).

*Failure to Defer to the Opinion of the Treating Physician*

Pasco argues that in making this finding on clonus, the ALJ did not give proper deference to the "treating physician" status of Dr. Charkawi. "In evaluating a claimant's alleged disability, medical opinions and diagnoses of treating physicians are entitled to great weight." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir.1984)). Pursuant to the Social Security Administration's "treating source" regulation, an ALJ gives more weight to opinions from treating sources because

-11-

these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

An ALJ must give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *Wilson*, 378 F.3d at 544. However, the ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton*, 246 F.3d at 773 (citations omitted). If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson*, 378 F.3d at 544. The regulation requires the ALJ to "give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).[5]

---

[5]A Social Security Ruling explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996). "The requirement of reason-giving exists, in part, to let claimants understand the

In considering Dr. Charkawi's opinion, the ALJ found as follows:

The claimant's family physician, Zack Charkawi, M.D., Family Medicine Specialist, completed a physician certification of medicaton dependency for the disability assistance program form. Dr. Charkawi states that the claimant's physical problems are clonus of the upper extremities, and poor reflexes in the lower extremities. The [ALJ] notes that there are *no office notes or other treatment records from Dr. Charkawi*.[6] Dr. Charkawi then recites the claimant's subjective statements concerning her own limitations. *He opines that the claimant can lift six to ten pounds frequently and up to five pounds occasionally. This opinion appears self-contradictory . . . .* He then concludes that the claimant is unemployable. *There is nothing objective to support any of these statements and the [ALJ] does not accept them.* Dr. Charkawi further assesses the claimant's mental capacity and finds several extreme and marked limitations, with *no medical supportive evidence or discussion to support them*.[7] The undersigned believes assessment in this area is well beyond Dr. Charkawi's area of expertise and does not believe he is qualified to make such conclusions. Regardless, it is obvious that Dr. Charkawi has accepted all the claimant's subjective complaints and he is therefore not being entirely objective.

(J.A. at 22-23) (emphasis added). The ALJ thus declined to give Dr. Charkawi's opinion controlling

weight where he specifically found that the opinion was not supported by objective medical

disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999)). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id.* (citing *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004)).

[6]The forms completed by Dr. Charkawi do not indicate how long he had been treating Pasco before completing the forms in February and March 2001. Exhibit 23F (J.A. at 409-412). However, in describing Pasco's complaint that she "was lost coming to my office," Charkawi notes that "she's been here numerous times." (J.A. at 412).

[7]When asked on the form, "What observations and/or medical evidence led to you findings" regarding Pasco's mental functional capacity, Dr. Charkawi wrote as follows: "The patient is impatient. Easily distracted, she can't sit still for a long period of time without moving & pacing. She has lack of concentration, but she maintains good hygiene & appearance. She has a good eye contact but less interaction with people (nurses) – she has poor immediate & short memory. She claims that she was lost coming to my office & she's been here numerous times. She has no set goals for the future when asked about plan." (J.A. at 412).

-13-

evidence. The ALJ appears to have taken all the necessary factors (e.g., supportability of the opinion, specialization of the treating source, consistency of opinion with the rest of the record) into consideration in determining what weight to assign to Dr. Charkawi's opinion.

Characterizing the ALJ's finding that Dr. Charkawi's opinion lacked support from objective medical evidence as a finding that Dr. Charkawi did not perform medical tests, Pasco contends that Dr. Charkawi did conduct medical tests, such as the finger-to-nose test to measure coordination. (J.A. at 409). However, Pasco has provided no evidence as to whether the finger-to-nose test alone is sufficient to support Dr. Charkawi's diagnoses as to the severity of Pasco's symptoms.[8] Therefore, we find that the ALJ did not err by declining to give controlling weight to Dr. Charkawi's opinion that Pasco exhibited clonus.

Aside from Dr. Charkawi's report, the administrative record[9] contains no other objective medical evidence that Pasco exhibited clonus. Therefore, the ALJ's finding regarding clonus is not error under the substantial evidence standard and *Duncan*.

*Dr. Govindan*

Pasco also claims that the ALJ erred by not giving proper controlling weight to certain

---

[8]Dr. Charkawi's report does not state that he observed clonus during the finger-to-nose test. He only mentions poor coordination. Clonus is "a rapid succession of alternating contractions and partial relaxations of a muscle occurring in some nervous diseases." *Merriam-Webster's Collegiate Dictionary* (10th ed. 1998).

[9]On August 27, 2001, Dr. Govindan, Pasco's treating neurologist, noted that she was "having increasing symptoms of twitches, involving the arms and the leg." (J.A. at 461). This letter, however, was not part of the record before the ALJ. See discussion below. It is also not clear from the letter if Dr. Govindan (or his staff) observed the twitches firsthand, given that Dr. Govindan notes in the same letter, "Neurological examination was done. No significant new abnormality noted."

-14-

reports made by her treating neurologist, Srini Govindan, M.D. Specifically, Pasco claims that the ALJ ignored Dr. Govindan's recording of neurological abnormalities during three separate exams in 1995,[10] as well as a 1996 letter stating that Pasco had "problems in the back of her skull from the [1992] injury."[11] (J.A. at 419 (1996 letter), and at 421, 424, 425 (1995 exams)).

The ALJ's decision discussed only a portion of Dr. Govindan's records: "Srini Govindan, M.D., whose specialty is neurology, treated the claimant from March 1995 through at least March 2001. On March 8, 2001, the doctor reported that neurological testing/examination was completed with no significant abnormality noted." (J.A. at 20). Specifically, Dr. Govindan's March 8, 2001, report stated as follows:

> Ms. Pasco was seen today for her compensable injury. She is complaining of headache, dizziness and memory problems.
>
> Neurologically she is conscious, alert and oriented. She takes Paxil for [sic] her family physician. Neurological examination was done. No significant focal abnormality noted. I refilled her Midrin. She will not be able to return to her original job.

(J.A. at 413).

Pasco does not specifically explain whether or how the 1995 and 1996 tests support her

---

[10]On March 29, 1995, Dr. Govindan diagnosed Pasco with "Traumatic brain injury with post traumatic symptoms," and his exams found "small subcutaneous tenderness in the left leg, right occipital – parietal area craniotomy defect, left ear bullet injury." (J.A. at 425). On June 15, 1995, Dr. Govindan noted "some ptosis on the right." (J.A. at 424). On September 13, 1995, the doctor reported that she "ha[d] a large hole in the right parietal area and the entrance wound was on the left side," that Pasco "[was] having some visual phenomenon," that her SPECT exam was "abnormal," and that her EEG was "mildly abnormal." (J.A. at 421).

[11]Dr. Govindan's 1996 letter more fully explained, "The patient continues to have problems with memory, but no loss of consciousness or seizure activity and no incontinence. She may be having absence episodes. I examined her today and her reflexes, coordination, sensory and motor exam shows no significant abnormality. She has problems in the back of her skull from the injury." (J.A. at 419).

disability claim.  She does not explain on appeal whether the symptoms or abnormalities noted affect her ability to work.  Pasco's citations to these reports appear to be an attempt to support her overarching claim that  the ALJ minimized the lasting impact of the injuries she suffered as a result of the 1992 shooting.

In its response to Pasco's appeal, the Government notes that the 1995 and 1996 exams by Dr. Govindan took place well before Pasco's alleged onset date of November 1999 and thus are not "time relevant."  However, the ALJ considered evidence from psychological and psychiatric exams that took place prior to 1999, so it does not appear that the ALJ necessarily found the earlier exam irrelevant.  In noting that Dr. Govindan treated Pasco from 1995 until 2001, however, the ALJ attached significance to the fact that Dr. Govindan's most recent exam in March 2001 had found no significant abnormality.  Moreover, the ALJ ultimately agreed with Dr. Govindan's opinion in March 2001 that Pasco could not "return to her original job."  After reviewing the record, the Court finds that, given the March 2001 exam's finding of no significant abnormality, the ALJ properly considered this treating physician's opinion, and the ALJ's failure to discuss the earlier exams performed by Dr. Govindan was not error.

*Failure to Mention Dr. Chattha*

Pasco also claims that the ALJ erred by failing to mention the report of Dr. Chattha, a consultative neurologist who evaluated Pasco in October 1997.  (J.A. at 336-39).  Specifically, she states that Dr. Chattha's finding that she was 5% impaired under the "lack of coordination" scales supports Dr. Charkawi's later finding that she had poor coordination.  Dr. Chattha's finding appears to be based on "mild difficulty in ambulation."  Overall, Dr. Chattha found Pasco had a combined physical impairment of 19%.  Every impairment Chattha described (mild difficulty in ambulation;

tinnitus; hearing loss in one ear; and history of open head and ear wounds with brief coma) was classified as "mild." (J.A. at 339). Pasco fails in her briefs to address whether a 19% impairment in 1997 supports her disability claim. Chattha, because he evaluated Pasco only once at the request of the Commissioner, was not a treating physician. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). We find that the ALJ's failure to discuss Dr. Chattha's 1997 report was not error.

*Failure to Mention Bailey, McFadden, & Worthington*

Pasco also claims that the ALJ erred by failing to mention two treating psychologists, John McFadden, Psy.D., and Patricia Bailey, Ph.D. (who worked under McFadden's supervision), and their psychiatrist colleague, Kathryn Worthington, M.D. The record indicates that McFadden saw Pasco in counseling sessions from early 1994 to late 1994 or early 1995 and then again in June 1996. ( J.A. at 245-263).[12] In March 1997,[13] Dr. Worthington performed a psychiatric intake on Pasco on referral from Dr. Govindan. (J.A. at 433-436). There is no indication in the record that, at the time, Pasco followed up on this intake with any counseling administered by McFadden or another colleague. Pasco returned to McFadden in 2001. McFadden performed a psychiatric intake on March 23, 2001. (J.A. at 430-432). Thereafter, McFadden referred Pasco to Dr. Bailey, whom he was supervising, for further counseling. (J.A. at 427-29) (Bailey records).

In her original brief on appeal, Pasco alleged that the ALJ erred by not mentioning these three sources, but she did not detail any findings, opinions or diagnoses made by these treating

---

[12]Pasco was introduced to Dr. McFadden by another treating physician, Dr. Kennedy, at the Family Health Center in Wheeling, West Virginia. McFadden's records for 1994 to June 1996 are only a portion of the Family Health Center records found at J.A. 245-263.

[13]By March 1997, Dr. McFadden and Dr. Worthington practiced together at Behavioral Health Management Group, Inc., in Wheeling.

sources or specify how these sources support her claim for benefits or weigh against the ALJ's denial of benefits. However, Pasco discusses the sources' relevancy to her disability claim in her reply brief.

This Court may not be compelled to reverse the ALJ for failing to explain properly the weight given to a treating source, if the failure is harmless error, such that the claimant in fact had the benefit of the procedural safeguard of reasons. *Wilson*, 378 F.3d at 547. Dr. Bailey's records are exclusively records of specific counseling sessions with Pasco. Pasco claims that Dr. Bailey's observations of Pasco's anger and tearfulness support her claim for disability. However, the ALJ specifically found that Pasco had severe depression and post-traumatic stress disorder. Because the ALJ agreed with Bailey's conclusions, his failure to give reasons for the amount of weight placed on Bailey's opinion is, at most, harmless error. *See id.* (noting in dicta that a finding of harmless error may be appropriate "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion").

The failure to mention Dr. Worthington's 1997 psychiatric intake report is not error. Pasco states that Dr. Worthington noted two impairments that limited her ability to work: diminished hearing in one ear and auditory hallucinations. Pasco states in her brief that the ALJ "explicitly rejected" the diminished hearing complaint "despite confirming evidence." Reply Brief at 7. Pasco's assertion is false; the ALJ did not explicitly state that Pasco had no hearing problem. The ALJ stated that she had "no physical limitations," but this was in the context of discussing her RFC rather than her physical ailments. (J.A. at 23). As for the alleged auditory hallucinations,[14] the

_____

[14]Dr. Worthington noted of her mental examination of Pasco: "Hallucinations of an auditory nature are evident. She hears her name called." (J.A. at 434).

-18-

record provides no evidence that Pasco emphasized such auditory hallucinations during her current application and hearing process or that Pasco even still claims to suffer from such auditory hallucinations. Worthington was not a treating physician; she performed only one intake report. Accordingly, the failure to mention Dr. Worthington's 1997 exam was not error.

We are surprised that the ALJ did not mention Dr. McFadden or his treatment of Pasco given that Dr. McFadden did treat Pasco for several months in 1994-95. However, we note that the ALJ's findings were consistent with most of the observations and diagnoses made by Dr. McFadden then and in 2001, given the ALJ's findings that Pasco had severe post-traumatic stress disorder and depression and had severe borderline intellectual functioning. Pasco focuses on two findings in Dr. McFadden's 2001 report that she claims the ALJ did not acknowledge: a finding of "traumatic brain injury" and a Global Assessment of Functioning ("GAF") score of 45-50. For reasons we discuss in further detail below, we find the failure to address specifically the "traumatic brain injury" diagnosis is not reversible error. As for the GAF score, Pasco has not argued whether a score of 45-50[15] is necessarily inconsistent with the ALJ's finding that Pasco was unable to perform any of her past relevant work and can only work in "a low-stress environment, limited to work involving one-to-two step instructions and tasks; [with] no more than occasional interaction with others." (J.A. at 23). In addition, the validity of the GAF score given by Dr. McFadden in 2001 is in obvious

_____

[15]A GAF of 41-50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." DSM-IV, *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, American Psychiatric Association, Washington, D.C., 1994.

question because it is based on flawed work-history information obtained from Pasco.[16] Because the ALJ adopted Dr. McFadden's diagnoses of depression and post-traumatic stress disorder, any failure to give reasons for the weight accorded to Dr. McFadden's opinion was harmless error. *See Wilson*, 378 F.3d at 547.

*Failure to Credit Roommate's Testimony*

Pasco's roommate, Alan Goff, gave a statement to an SSA representative concerning Pasco's activities at home. (J.A. at 157). The ALJ found that Goff's statement was not "entirely credible" given Pasco's descriptions of her own daily activities and the lack of objective medical evidence of her alleged physical problems.[17] (J.A. at 19). Pasco claims this determination was error. However, we cannot review an ALJ's determination of credibility. *Heston*, 245 F.3d at 536 (citing *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972)).

*Failure to Mention the Mother's Testimony*

Pasco also claims that the ALJ erred by failing to discuss a letter written to the SSA by her mother, Evelyn K. Pasco. (J.A. at 165-66). Though her mother stated that she had observed Juanita Pasco having trouble sitting, standing and walking and that her legs and feet "are becoming

---

[16]McFadden states in his report that Pasco had "essentially not worked" since the 1992 shooting, a statement that does not accurately reflect Pasco's work history. Because a GAF of 41-50 can be based on the fact that a person is unable to keep a job, inaccurate information about employment may affect the validity of the GAF score. In Pasco's case, there is no evidence that she was fired from her most recent jobs – she voluntarily quit primarily due to her alleged physical symptoms of leg pain and the long commute times.

[17]The ALJ's sentence on Goff's statement actually reads, "For the same reason [the ALJ rejected some of Pasco's allegations of physical limitations], the undersigned does find the statement of the claimant's friend to be entirely credible." Both parties apparently agree, however, that the word "not" was inadvertently left out of that sentence.

-20-

deformed and toes go numb," her mother noted that she only saw Juanita "on some holidays or when I have to stop where she lives." Given the ALJ's lengthy discussion of the lack of objective evidence supporting these claimed physical limitations, we find that the ALJ's failure to mention specifically the mother's letter is not reversible error.

*Alleged Failure to Combine Severe and Non-severe Impairments*

Pasco claims that the ALJ erred by failing to consider her non-severe impairments with her severe impairments in determining whether she is disabled. Our review of the ALJ's decision, however, indicates that the ALJ did not fail to combine all of Pasco's impairments. The ALJ specifically noted that the Regulations required him to consider all medically-determinable impairments together if he found any one impairment severe. (J.A. at 18). *See* 20 CFR §§ 404.1523 and 416.923. Pasco's allegation appears based on a belief that had the ALJ considered all of her non-severe and severe impairments, he would have found her disabled.

*Failure to Defer to Prior Findings of the SSA*

Pasco alleges that the ALJ erred when he failed to give deference to the Commissioner's previous "findings" on evaluation and reconsideration of her application regarding her headaches and leg and foot pain. Pasco specifically refers to the SSA's statements that "You have experienced leg and foot pain since that time. You do still have headaches at times." (J.A. at 65). Pasco claims that the Regulations bind the ALJ to these findings, but cannot point to a regulation that specifically states that. She relies primarily upon 20 C.F.R. § 404.946(a), which provides, "The issues before the administrative law judge include all the issues brought out in the initial, reconsidered or revised determination that were not decided entirely in your favor." The same regulation provides that "if evidence presented before or during the hearing causes the administrative law judge to question a

-21-

fully favorable determination, he or she will notify you and will consider it an issue at the hearing."

20 C.F.R. § 404.946(a). The regulation also provides that an ALJ can raise a new issue so long as

proper notice is given to the claimant. 20 C.F.R. § 404.946(b).

In Pasco's case, the ALJ's notice of the hearing (J.A. at 28) stated that the ALJ would be

reviewing the "severity of your impairment(s)," which indicates that the ALJ would be reviewing

the severity of her headaches and leg and foot pain. 20 C.F.R. § 404.939 requires a claimant to

express before the hearing any objections she has to issues the ALJ seeks to decide at the hearing.

Pasco did not so object. Pasco testified about her leg and foot pain and headaches at the hearing,

and her attorney presented evidence on such conditions. Therefore, Pasco cannot argue that any

"misunderstanding" of the issues to be reviewed by the ALJ prevented her from adequately

presenting evidence to the ALJ on the leg and headache issues.

We, however, do not find that the ALJ disagreed with the prior statements made by the SSA.

The ALJ never disputed that Pasco experienced *any* leg or foot pain or *any* headaches; he only

concluded based on the objective medical evidence that these conditions were not "severe." The

SSA's Notice never found these conditions to be severe; it *questioned* the severity of these

conditions by noting that Pasco was able to walk and that she was able to function adequately. (J.A.

at 65).

*Failure to apply the* "Walston *inference*"

Pasco claims that the ALJ erred when weighing the evidence because the case *Walston v*

*Garner*, 381 F.2d 580 (6th Cir. 1967), requires the ALJ to infer that she is truly disabled from her

attempts to work. In *Walston*, this Court held that "[w]here an applicant has unsuccessfully

attempted to secure employment, less evidence is needed to support of finding of disability than

-22-

where the applicant has failed to make such an effort." 381 F.2d at 586-87. Pasco interprets this as an evidence standard applicable to all cases. Thus, she reasons her continued employment after her traumatic injuries in 1992 should result in a higher burden on the Commissioner to prove that she is not disabled.

This argument fails for various reasons. While we do look to a claimant's attempts at work to determine whether the claimant can engage in substantial gainful activity, *Walston* does not stand for the hard and fast evidentiary rule that Pasco desires. In *Walston*, the court reversed a determination that a claimant was not disabled by noting that claimant's efforts to find employment were hindered by constant back pain following an accident years before. The court in *Walston* thus made this statement as further proof that the claimant really did suffer from a disability, not as a general evidentiary standard.

Moreover, this argument does not fit logically with Pasco's theory of her own disability. She claimed that the onset of her disability occurred in 1999 when she quit her last job and stopped seeking employment, not in 1992 when she was traumatically injured. Her theory of disability is that even though her disability stems from the 1992 shooting, it was the worsening of symptoms that caused her to seek disability. Finally, the ALJ agreed that Pasco was unable to perform the type of work she tried to perform between 1992 and 1999; the disagreement is over whether Pasco can do a different type of work.

*Failure to Consider "Traumatic Brain Injury" and "Organic Mental Disorders" in Appendix 1*

At the third step of his analysis, the ALJ considered whether Pasco's combination of impairments equaled an Appendix 1 by looking at the criteria listed in 12.04 (Affective Disorders); 12.05 (Mental Retardation); and 12.06 (Anxiety-Related Disorders). Pasco asserts that the ALJ

-23-

should also have evaluated her impairments under 12.02 (Organic Mental Disorders) and 11.18 (Cerebral Trauma/Traumatic Brain Injury). Pasco's counsel at her hearing before the ALJ specifically argued that Pasco met the requirements for Organic Mental Disorders under 12.02. (J.A. at 174). The counsel did not refer to 12.04, 12.05, or 12.06, and did not refer to 11.18. However, Pasco's counsel noted Dr. Govindan's diagnosis of traumatic brain injury at the July 2001 hearing. (J.A. at 44).

Pasco has not provided the Court, and we have not found, any authority that requires the ALJ to evaluate a claimant's symptoms of mental disorder under one mental disorder listing (e.g., 12.02) if evaluation of the symptoms under other listings (e.g., 12.04, 12.06) is more appropriate. In Pasco's case, the primary psychiatric diagnoses found throughout the medical record are post-traumatic stress disorder, depression, and borderline intellectual functioning, all of which the ALJ found to be severe impairments. Given these diagnoses and findings, it was more appropriate to evaluate Pasco's combination of impairments under 12.04 (Affective Disorders –e.g., depression) 12.05 (Mental Retardation) and 12.06 (Anxiety Disorders – e.g., post-traumatic disorder) than 12.02, which requires a medical or laboratory finding of a "specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02. In other words, the medical and psychological evidence in the record did not require the ALJ to evaluate Pasco's mental impairments under 12.02.[18]

_____

[18]We note that the criteria listed in 12.02B are exactly the same criteria listed in 12.04B. The ALJ found that Pasco did not meet the criterial in 12.04B, as he did not find that she had "marked" restriction of daily living activities, "marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence or pace; or any repeated episodes of decompensation of extended duration. He found that Pasco only had mild restriction of daily living activies; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and no episodes of

Sections 11.18 (Cerebral Trauma) and 11.00(F) (Traumatic Brain Injury) direct the ALJ to evaluate traumatic brain injury under 11.02 (Epilepsy - Major); 11.03 (Epilepsy - Minor); 11.04 (Central Nervous System Vascular Accident); and 12.02 (Organic Mental Disorder). Pasco has claimed only that she meets 12.02, and nothing in the record indicates that the ALJ should have looked at 11.02, 11.03, and 11.04. As discussed above, we believe that the diagnoses and symptoms documented in the record warranted evaluation under 12.04, 12.05, and 12.06 rather than 12.02. Although any layperson would describe Pasco's having been shot twice in the head as a "traumatic brain injury," the impairments that she alleges resulted from her injury do not appear to be contemplated by the Regulations' definition of traumatic brain injury.

*Different RFC Given to Vocational Expert*

At the July 2001 hearing, the ALJ posited a "light RFC" to the vocational expert.[19] In response, the VE testified that Pasco could work as either an office cleaner (400,000 jobs nationally/ 8,000 regionally) or hotel/motel cleaner (200,000 jobs nationally/ 4,000 regionally). (J.A. at 52). By the time the ALJ wrote his ruling, however, he had determined that a light RFC was not

_____

decompensation of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C) ("Where we use 'marked' as a standard for measuring the degree of limitation, it means more than moderate but less than extreme."); *see Hathaway v. Comm'r of Soc. Sec.*, 238 F.3d 421, n. 1 (Table) (6th Cir. 2000) (unpublished) (citing *Cruse v. U.S. Dep't of Health & Human Servs.*, 49 F.3d 614, 618 (10th Cir. 1995)). Therefore, if the ALJ's findings under 12.04B are supported by substantial evidence, Pasco would also not meet an Appendix 1 impairment under the criteria of 12.02B.

[19]The ALJ's hypothetical: "[L]et me ask you to assume a hypothetical individual of the claimant's age, educational background and work history. Assume the individual would be able to perform light work with a sit/stand option. Should work in a low-stress environment. Would be limited to work involving simple one-to-two step repetitive type instructions and tasks. And should have no more than occasional interaction with others. Would there be any work in the regional or national economy that such a person could perform?" (J.A. at 52).

warranted by the evidence. The ALJ concluded that Pasco had no physical limitations; must work in a low-stress environment; must be limited to work involving one-to-two-step instructions and tasks; and could have no more than occasional interaction with others. (J.A. at 23). The ALJ found that this RFC enabled Pasco to perform a "significant range of work at all exertional levels," but not "a full range of work at any level." (J.A. at 25).

Pasco claims that the ALJ's determination of an RFC other than the one he posited to the VE warrants reversal. Once the ALJ determines that a claimant does not have the RFC to perform her past relevant work, the burden shifts to the Commissioner to show that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 529 (6th Cir. 1981)). To meet this burden, there must be "a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs." *Varley*, 820 F.2d at 779 (quoting *O'Banner v. Sec'y of Health & Human Servs.*, 587 F.2d 321, 323 (6th Cir. 1978)) (internal quotations omitted). Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, but only "if the question accurately portrays [claimant's] individual physical and mental impairments." *Varley*, 820 F.2d at 779 (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984) (internal quotations omitted); *see also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632-33 (6th Cir. 2004).

Therefore, we have remanded an ALJ's decision where the hypothetical posited to the vocational expert did not accurately reflect the claimant's limitations. *See Howard*, 276 F.3d at 241-43; *Cooley v. Sec'y of Health & Human Servs.*, No. 88-1465, 1989 WL 40141 (6th Cir. Apr. 10,

1989). In such cases, the ALJ mistakenly omitted some limitations when formulating the hypothetical. Here, however, the hypothetical posited to the VE was more favorable to Pasco than the RFC that the ALJ ultimately determined – an RFC that, as we discuss below, is supported by substantial evidence. The hypothetical assumed the same mental limitations (low-stress environment; one-to-two-step instructions and tasks; and no more than occasional interaction with others) that were later included in the final RFC, but the hypothetical included more physical limitations by requiring "light work" with a "sit/stand option." In response, the VE responded that Pasco could still perform a substantial number of jobs in the regional and national economy. The ALJ's ruling that Pasco is able to perform a substantial number of jobs does not rely on any other testimony besides the number of jobs identified by the VE.[20]

Pasco argues that not all jobs associated with a light work RFC are included in the numbers of jobs associated with a "no-physical-limitations" RFC. Specifically, Pasco argues that sedentary or light work jobs can involve skills that Pasco does not have. However, the ALJ's hypothetical told the VE to take into account Pasco's educational background and work history. Therefore, by relying solely on the VE's testimony, the ALJ did not consider jobs that involved skills that Pasco does not possess.

Because (1) the ALJ relied solely on the testimony of the VE regarding the number of jobs which Pasco could perform in the economy, (2) the VE's testimony was based on a hypothetical that reflected the same mental/emotional limitations that we find supported by substantial evidence, and

---

[20]Pasco alleges in her appellate brief that the ALJ's finding on the number of jobs is unclear – that it is "either" the VE's testimony or the ALJ's reference to "the framework of Medical-Vocational Rule 204.00." (J.A. at 24). However, the ALJ specifically states that his finding was "[b]ased on the testimony of the vocational expert." (J.A. at 24).

(3) such testimony was based on a hypothetical that was more favorably physically than the RFC we find supported by substantial evidence, we hold that finding an RFC different from the hypothetical given the VE was not reversible error.

*Formulation of RFC*

After reviewing the record as a whole, and taking into consideration the specific errors alleged by Pasco, we conclude that the ALJ's findings regarding the severity of Pasco's impairments, her failure to meet an impairment listed in Appendix 1, and her RFC, are supported by substantial evidence. There is no doubt that Pasco suffered through a horrible, traumatic event when she was kidnapped, raped, and shot twice in the head in 1992. There is also no doubt that the event left her with residual physical and mental impairments. Specifically, it left her with a loss of hearing in one ear and perhaps is the cause of some of her headaches. It left her dealing with severe post-traumatic stress disorder and depression. Her intellectual functioning has been determined to be borderline. However, the evidence in the record shows that she can engage in daily activities such as housekeeping, doing laundry, and maintaining a neat, attractive appearance. It also shows that she can engage in reading[21] and playing cards on a regular basis, both of which require some concentration. The ALJ's finding that she could follow one-to-two-step instructions is supported by virtually every medical and psychological source included in the record, including Dr. Govindan, Dr. Paroda, Drs. Tosi and Murphy, Dr. Rush, Dr. Worthington, Dr. McFadden, Dr. Bousquet, Dr. Michael, and Dr. White. Accordingly, we find that the ALJ's finding regarding Pasco's

---

[21]Pasco criticizes the ALJ for disregarding her hearing testimony that she could read only up to "half an hour to an hour" (J.A. at 46) in favor of her statement on a questionnaire submitted to the SSA that she could read up to two hours. (J.A. at 149). Pasco continually refers to the questionnaire as an "unsworn statement," but the record indicates that this questionnaire may have been submitted with another form under penalties of perjury.

nonexertional limitations is supported by substantial evidence.

As for her alleged physical limitations, we find that there is also substantial evidence to support the ALJ's finding because, as explained above, there is little objective medical evidence supporting the alleged severity of her leg and foot pain, headaches, and clonus.

We recognize that this is a close case given her post-traumatic stress disorder and depression, but because substantial evidence exists to support his findings, we must defer to the ALJ's fact-finding role and his determination of the claimant's credibility, as he has personally observed the claimant at the hearing.

*Post-ALJ Decision Errors*

We now address the errors Pasco alleges took place after the ALJ rendered his decision.

After the ALJ issued his decision in January 2002, Pasco submitted additional evidence to the Appeals Council. The Appeals Council apparently considered it (J.A. at 9), but concluded the additional evidence did not "provide[] a basis for changing the [ALJ's] decision." This evidence consisted of documents from Dr. Govindan from examinations given after July 25, 2001, the date of Pasco's hearing.

"[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision. The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.

1996).        Pasco claims that the district court should have considered this additional evidence because she had good cause for not presenting it in the prior proceeding. While the documents are from examinations conducted on August 27, 2001, after the hearing, the ALJ's decision was not rendered until January 2002. Pasco states that she "made a motion to supplement the record" but does not specify where that motion is located in the administrative record or if these documents were part of that motion. Appellant's Brief at 40. Therefore, Pasco has not provided good cause why this evidence was not presented to the ALJ before he issued his decision, and the district court's refusal to remand was not error.

Pasco also alleges that the district court erred in concluding that she did not object to the Magistrate Judge's finding in the Report and Recommendation that she has no physical limitations on her ability to work. Pasco claims that she did object and thus did not waive the argument. Because the record is unclear as to whether Pasco waived this objection, we have proceeded to consider her argument, though we have found that substantial evidence supported the ALJ's decision regarding her physical limitations.

Finally, Pasco alleges that the Magistrate Judge and the district court impermissibly used post-hoc rationalizations to uphold the ALJ's decision and did not properly consider all of her assignments of error. Having conducted our own review of the ALJ's decision and found it supported by substantial evidence, we need not address these alleged errors.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.